**PAPALIʻI E. TAIMALELAGI and FUIMAONO TUPUTALA,**
**Plaintiffs**

v.

**IOELU PEN and JOHN'S GENERAL CONSTRUCTION,**
**Defendants**

High Court of American Samoa
Trial Division

CA No. 50-89

March 5, 1991

Before KRUSE, Chief Justice, and MATAʻUTIA, Associate Judge.

Counsel: For Plaintiffs, Asaua Fuimaono
For Defendants, Togiola T.A. Tulafono

Plaintiffs claim that they had agreed with the defendant Ioelu Pen to the formation of a three-way partnership in connection with a certain contract with the Christian Congregational Church in American Samoa (CCCAS) for the construction of certain buildings, and that as a partnership they had also secured another contract with the Government of American Samoa to build certain classrooms for the Lupelele Elementary School. Notwithstanding a regular, weekly wage which each had received during the construction period, plaintiffs are claiming, in addition, an equal entitlement to share in any partnership profits for the construction ventures.

Defendant Pen, on the other hand, denies the formation of a partnership; he claims that plaintiffs were at all relevant times under the employ of his family's business, d.b.a. John's General Construction, and licensed under the name of his wife, Mrs. Emma F.C. Pen. In actuality, the parties had worked together over the course of a year on the two different projects under the banner of John's General Construction while also utilizing the pertinent trade licenses that were issued defendant Pen. Finally, Pen also counters that the plaintiffs were adequately compensated for their respective services.

## DISCUSSION

### I. A Partnership

The partnership claim, even if factually correct, is unenforceable. It was candidly conceded in the testimony for plaintiffs that pending the completion of all the partnership formalities --- which included, among other things, the completion of a written partnership agreement and the finalization of a license to do business pursuant to the licensing laws, A.S.C.A. §§ 27.0201 et seq. (hereinafter the "licensing Act") --- the parties had agreed to commence the CCCAS contract under Mrs. Pen's business license because of the time delay involved with setting up a duly-licensed business partnership.

But this sort of an agreement would, in effect, be an agreement to disobey the very clear requirements of the licensing Act. Specifically, A.S.C.A. §§ 27.0219 provides that:

(a) No person may engage in business in American Samoa without a [business] license. . . .

83

(b) Any person who is required * * * to obtain a license * * * and refuses or fails to obtain the license * * * shall be guilty of a class B misdemeanor.

In addition A.S.C.A. § 27.0212 states that:

Every license [to do business in American Samoa] issued under [the licensing Act] is *personal * * * and may not in any circumstances be transferred to any other person. . . .*

(emphasis added). Clearly, an agreement between the parties, as a partnership, to start to work under the guise of Mrs. Pen's business license would clearly be a breach of the licensing Act, which not only criminally prohibits anyone from engaging in business without a license but also deems a license to be personal and non-assignable.

Here, the Court is asked to enforce claimed partnership gains derived while in violation of the licensing Act. Such demands are, however, unenforceable, since an agreement to violate or inhibit licensing laws is clearly illegal and contrary to public policy. *See* 6A Corbin on Contracts § 1510. Fortunately, we need not here confront the "unruly horse"[1] criticism of "public policy," as no clearer statement of territorial public policy can be found regarding the licensing Act than that contained in A.S.C.A. § 27.0201. This enactment reads:

The purpose of this chapter is to provide for the licensing of businesses in the Territory of American Samoa in order that all the necessary and reasonable control and regulation thereof may be practiced by the government for *the protection of the health, welfare, safety and morals of the people of American Samoa.*

(emphasis added). Furthermore, in the context of licensing statutes, the Restatement of Contracts (Second) § 181 provides that:

---

[1] A nineteenth century English judge spoke of "public policy" as "a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." Burrough, J., in *Richardson v. Mellish*, 2 Bing. 229, 252, 130 Eng. Rep. 294, 303 (1824).

> If a party is prohibited from doing an act because of his failure to comply with a licensing * * * requirement, a promise in consideration of his doing that act or of his promise to do it *is unenforceable on the grounds of public policy if*
>
> (a) the requirement has a *regulatory* purpose, and
>
> (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.

(emphasis added). The licensing Act's legislative scheme is unmistakably regulatory. As may be noted above from A.S.C.A. § 27.0201, the licensing Act has an overall regulatory purpose relating to the general "health, welfare, safety and morals of the people of American Samoa." This regulatory purpose is also clearly evident in A.S.C.A. § 27.0208, which sets out certain standards relevant to the issuance of business licenses in general, while A.S.C.A. § 27.0207 sets out more specific guidelines relevant in terms of regulating the influx of foreign business ventures. Thus, to enforce the sort of claims asserted by plaintiffs is not only to undermine the licensing Act itself but also those very clear public purposes behind the Act. The crucial significance of these purposes are not difficult to imagine when viewed in the context of a small island territory's social and economic development needs. *See* A.S.C.A. § 27.0208(3). At the same time, the licensing Act demands vigilance against allowing business needs to overwhelm the territory's ability to maintain comparable infrastructure. *See* A.S.C.A. § 27.0207.

Thus, an agreement by the parties which induces a breach of the licensing Act is unenforceable under either criterion supplied by the Restatement. The licensing Act is not only regulatory in design, but also its underlying public purpose is clearly pervasive and of significant social impact.

We conclude on the foregoing that in a situation of partnership among the parties, any related claims to gain would be unenforceable since the parties were content to undertake business in violation of the licensing Act and the very clear public policy embodied thereunder.

*II. An Employment*

We also conclude on balance that the evidence preponderates in favor of defendant Pen's version of the facts; that is, his relationship to plaintiffs was that of employer. The evidence had it that Mr. Papali'i's

principal duties in relation to the contract jobs was the arranging of immigration clearances for a certain number of labors from Western Samoa as seasonal workers under the sponsorship of John's General Construction. At the same time, plaintiff also claimed that he attended to the transport needs of these particular laborers, to and from the site on a daily basis, with his own personal vehicle.[2] In turn, Mr. Papali'i was paid a weekly wage of $320.00 or $8.00 per hour until his services were terminated by Mrs. Pen in a letter dated April 13, 1987.

The evidence also preponderates in favor of defendant Pen's claim that Papali'i was paid all that was due to him. As an hourly wage earner, Papali'i was regularly paid 40 hours a week. Such work hours, however, would only accumulate after Mr. Papali'i's regular work day with the American Samoa Government, who was then his full-time employer.

With regard to plaintiff Fuimaono, it was more clear than not on the evidence that Mr. Fuimaono was paid less than what he was entitled to be paid under the laws of American Samoa. The evidence showed, first of all, that Mr. Fuimaono was a master carpenter of noted repute throughout Samoa. Indeed, it was also suggested on the evidence that Mr. Fuimaono's reported affiliation with John's General Construction had a lot to do with the latter's success in getting the CCCAS contract award. For his labors, however, Mr. Fuimaono was paid the weekly wage of $400.00, representing an hourly rate of $10.00.

Contrary to Mr. Pen's testimony, Mr. Fuimaono testified that he regularly worked hours in excess of 8 hours a day, but he was never compensated for overtime.[3] We accept Mr. Fuimaono's version of the facts. While defendant Pen presented certain work schedules which purported to consistently show regular 8 hour days, the Court was also confronted with testimony regarding a delay in the timely completion of

---

[2] This is hardly persuasive evidence for equal sharing if the performance of these duties represented entirely Mr. Papali'i's partnership share in lieu of capital contribution.

[3] A.S.C.A. § 32.0323 states that "[n]o employer may employ and employee in excess of 40 hours per week unless such employee receives compensation for employment in excess of such weekly hours, at a rate not less than one and a half times the regular hourly rate at which he is employed."

the CCCAS project in accordance with contract requirements. Indeed, there was period of time where the parties had to accelerate work effort after the CCCAS had reluctantly agreed to grant an extension of time for completion, rather than insisting on liquidated damages. Moreover, after the Lupelele project had started, the parties were in fact involved with undertaking two jobs simultaneously. Fuimaono, as the master carpenter, directed and supervised the work on both projects, and this necessitated his literally having to do shift work. The two projects were concurrently worked on for a period of about five months.

We are satisfied that Fuimaono had worked a number of hours in excess of ordinary or regular working hours. Although Fuimaono estimated uncompensated time to be about 1000 hours, we find those excess hours (compensable pursuant to A.S.C.A. § 32.0323 at the rate of one and a half times the regular rate) to be more closer to a total of 800 hours. Accordingly, $12,000.00 is payable to Fuimaono for uncompensated overtime hours; however, $5,850.00 shall be allowed as offset for the monies advanced to Fuimaono over and above the weekly check he had regularly received.

Judgment will accordingly enter in favor of plaintiff Fuimaono against Ioelu Pen and Emma Pen d.b.a. John's General Construction, in the sum of $6,150.00. Plaintiff Papali'i shall take nothing by his complaint.

It is so Ordered.